UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:10-CR-120 JD |
| | ) | |
| JEREMIE SHENEMAN | ) | |

OPINION and ORDER

Pending before the Court is Defendant Jeremie Sheneman's Motion for a New Trial filed

pursuant to Federal Rule of Criminal Procedure 33 [DE 92].

## I. Procedural History

*The Charges*

On September 9, 2010, an indictment was filed charging Defendant Jeremie Sheneman

with three counts of wire fraud under 18 U.S.C. § 1343. Specifically, count 1 of the indictment

alleged that on or about October 3, 2005, Mr. Sheneman knowingly caused a wire transfer to be

transmitted in the approximate amount of $561,945.58 from Mellon Bank to Real Estate Closing

Account, and the funds were the proceeds of a mortgage loan for the purchase of 11-09A 128th

Street, College Point, New York; count 2 of the indictment alleged that on or about September

14, 2005, Mr. Sheneman knowingly caused a fax transmission to be sent from GreenPoint

Mortgage to Equity Settlement Services that requested completion of closing forms on the

property located at 11-11 128th Street, College Point, New York; and, count 3 of the indictment

alleged that on or about October 3, 2005, Mr. Sheneman knowingly caused a fax transmission to

be sent from Equity Settlement Services to A.W. First Source Funding that consisted of broker

fee request submissions and an insurance binder for the property located at 11-11 128th Street,

College Point, New York.

To sustain the charges, the government had to prove that Mr. Sheneman knowingly devised or participated in the scheme to defraud or to obtain money or property by means of false pretenses, representations or promises, as described in the count of the indictment; that he did so knowingly and with the intent to defraud; that the false pretenses, representations or promises were material; and that for the purpose of carrying out the scheme or attempting to do so, he caused interstate wire communications to take place in the manner charged in the particular count. *See United States v. Henningsen*, 387 F.3d 585, 589 (7th Cir. 2004); Pattern Criminal Federal Jury Instructions for the Seventh Circuit, p. 214.

***The Government's Theory***

The government's theory of the case was that Mr. Sheneman provided materially false information to mortgage brokers, Mr. Andrew Weiske and Mr. Alex Veksler, which was then relayed to prospective lenders to secure four million dollars in residential mortgage loans on behalf of his grandmother, Phyllis Sheneman. Mr. Sheneman himself had terrible credit and could not get approved for the loans, so he used Phyllis Sheneman's name and good credit to secure the mortgages on eight different properties. Although there was no evidence to indicate whether all of the mortgage loans were subprime or another type of loan, the government argued that regardless of the loan type, the lenders would (and did) rely on the information provided in the loan applications to determine the lenders' risk of lending before providing the mortgages.

The government contended that the scheme worked because Mr. Sheneman had knowledge of the lending process and prerequisites on account of his previous employment as a loan officer at Tri State Mortgage. Mr. Sheneman knew what false information to provide to get the loan applications approved, and then processed the loans through Superior Mortgage. In

particular, Mr. Sheneman submitted false information relative to Phyllis Sheneman's employment income, the nature and scope of her consignment shop, the extent of Phyllis Sheneman's actual financial liabilities, the intended use of the properties, and the source of the purchase price funds.[1]

### The Defendant's Theory

Mr. Sheneman's defense theory was that he merely assisted his grandmother in locating, purchasing, and managing the eight investment properties. And although he managed real estate from an office at Superior Mortgage, he was never a loan officer at Superior Mortgage and he did not process Phyllis Sheneman's loans. Mr. Sheneman acknowledged that he sent Phyllis Sheneman's actual bank statements and financial information[2] to Mr. Weiske and Mr. Veksler for the purpose of securing the mortgages; however, Mr. Sheneman denied completing the residential loan applications and denied reviewing the completed loan applications prior to their submission to the lenders. Mr. Sheneman maintained that the false information that ultimately appeared in the residential loan applications was the fault of the brokers and/or lenders, who assisted Phyllis Sheneman with completing the loan applications and calculated her income based on subprime lending programs available at the time. In particular, Mr. Sheneman would

---

[1]Paragraph 9 of the indictment alleged that Mr. Sheneman inflated Phyllis Sheneman's employment income, did not identify himself as the source of the purchase price funds, and falsely identified the intended use of the property. [DE 1 at 3-4]. Paragraph 10 of the indictment alleged that Mr. Sheneman obtained these mortgage loans by causing Phyllis Sheneman's actual financial liabilities to be omitted from the residential loan applications, knowing that the submitted list of financial obligations was not complete. [DE 1 at 4]. Paragraph 11 of the indictment alleged that for the purpose of obtaining the mortgages, Mr. Sheneman provided and caused others to provide supporting documentation which contained materially false and fraudulent representations concerning the nature and scope of Phyllis Sheneman's consignment shop, Second Time Around, located in Granger, Indiana. *Id*.

[2]Mr. Sheneman also admitted that he sent letters verifying that he provided money to Phyllis Sheneman to fund the loans and that the money was a gift. However, Mr. Sheneman denied sending any letters concerning the nature and scope of Phyllis Sheneman's consignment business.

argue that some of the mortgages were issued pursuant to a 'twelve-month bank statement subprime lending program' whereby income was calculated by the lender after a self-employed borrower sent the lender a year's worth of bank statements.

Mr. Sheneman contended that once the loan applications were completed by brokers and/or lenders, they were sent directly to Phyllis Sheneman, who signed all of them. Mr. Sheneman's position was that given the lending climate and loose lending standards at the time, the lenders never sought verification of the information contained in the loan applications and essentially subjected themselves to fraud by others.

### The Verdict

The jury did not believe Mr. Sheneman's story and found Mr. Sheneman guilty of all three counts of wire fraud on March 30, 2011. After the jury was discharged, counsel for Mr. Sheneman orally moved for a judgment of acquittal consistent with Rule 29(c), arguing that the verdicts were inconsistent with the evidence. The Court denied the motion on the basis of Rule 29's standard, finding that the evidence amply supported the verdicts.

Thereafter, Mr. Sheneman claimed that his convictions were the result of his trial counsel's ineffectiveness, thus denying Mr. Sheneman his Sixth Amendment right to an effective advocate. Given that Mr. Sheneman wanted his Rule 33 motion to allege the ineffectiveness of trial counsel, Mr. Robert Truitt, the Court: appointed Mr. Sheneman new counsel, Mr. Clark Holesinger [DE 82, 102]; gave Mr. Holesinger additional time to file the Rule 33 motion—which was filed [DE 92, 92-1, 93] and responded to [DE 105]; determined by agreement of the parties that Mr. Sheneman waived the attorney-client privilege with respect to Mr. Truitt's alleged ineffective assistance [DE 102]; and, held an evidentiary hearing on January 11, 2012 [DE 118].

During the evidentiary hearing, Mr. Truitt and Mr. Sheneman testified, and argument was presented by Mr. Holesinger and by counsel for the government [DE 118]. After the evidentiary hearing, counsel were afforded an opportunity to file supplemental briefs because Mr. Holesinger wanted additional time to consider whether he would be advancing arguments in addition to the issues identified at the evidentiary hearing. On January 26 and 30, 2012, counsel filed their supplemental briefs [DE 121, 122], and the matter is ripe for ruling.

### *Rule 33 Contentions*

Mr. Holesinger's original motion and memorandum [DE 92, 92-1, 93] provided an extensive list of vacuous contentions concerning Mr. Truitt's trial performance. For instance, Mr. Holesinger indicated that Mr. Truitt failed to limit evidence of mortgages outside of the indictment, failed to "call witnesses" including lenders and loan officers who would testify to subprime lending guidelines and requirements, and failed to do thirty-nine other identified actions that Mr. Sheneman and his family summarily listed in a three page document [DE 92-1, Exhibit A]. These contentions were not supported with any argument or analysis of how the identified conduct constituted deficient performance or resulted in prejudice to Mr. Sheneman. Mr. Holesinger specifically admitted that the concerns listed in Exhibit A, standing alone, did not meet Mr. Sheneman's burden in showing that had those concerns been addressed by Mr. Truitt, then the outcome of trial would have been altered. Thus, Mr. Holesinger represented to the Court that the Court should focus its attention only on the arguments made during the evidentiary hearing. Mr. Holesinger later confirmed that in fact he did not wish to elaborate on any items that were not raised at the hearing [DE 121].

As a result, Mr. Holesinger withdrew the Defendant's host of undeveloped and

unsupported arguments,[3] and presented only the following allegations of ineffectiveness for the

Court's consideration: (1) Mr. Truitt's failure to call an expert on subprime mortgage lending,

attorney Phillip Bornstein, and accountant Kenneth Daniel; (2) Mr. Truitt's failure to pursue the

origin and validity of the "411" letters; (3) Mr. Truitt's failure to assert the insanity defense; and,

(4) Mr. Truitt's statement during closing argument that a person "can't defraud someone or an

institution or a bank if they don't care if they are defrauded, and that's what has happened." [DE

81 at 132, Trial Transcript Vol. III].  The Court now addresses each of Mr. Sheneman's claims.

## II.  Rule 33 Standard

Under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and

grant a new trial if the interest of justice so requires."  The motion is addressed to the discretion

of the court and the power to grant a new trial should be invoked only in the most extreme cases.

*United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998), *cert. denied*, 525 U.S. 897 (1998);

*United States v. Gonzalez*, 93 F.3d 311, 315 (7th Cir. 1996) (citations omitted).

On a motion for a new trial, the court does not need to view all evidence in favor of the

---

[3]Had Mr. Holesinger not affirmatively withdrawn these contentions, they were effectively waived anyway in light of the fact that the Court has no way to evaluate the undeveloped arguments, and given the Seventh Circuit's reasoning that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues). *United States v. Hassebrock*, 663 F.3d 906, 914 (7th Cir. 2011) (citing *Trentadue v. Redmon*, 619 F.3d 648, 654 (7th Cir. 2010); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)).  This Court does not bear the obligation of researching and constructing the legal arguments open to the parties, especially when they are represented by counsel. *See Nelson v. Napolitano*, 657 F.3d 586, 589 (7th Cir. 2011) (noting that the party's failure to make a cogent argument was reason enough for the district court to deny the motion); *Beard v. Whitley County REMC*, 840 F.2d 405, 408-09 (7th Cir. 1988) (citation omitted). This is true even in the criminal context. *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) (citing *Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir. 1986)).  Additionally, because it is Jeremie Sheneman's burden to identify the acts or omissions of Mr. Truitt that could not be the result of professional judgment, the various unsupported contentions raised in the filings, including Exhibit A [DE 92, 92-1, 93], simply do not overcome the presumption that, under the circumstances, the challenged actions were sound trial strategy and that Mr. Truitt's representation fell within the wide range of reasonable professional assistance. *Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011) (citation omitted); *see also United States v. Lawson*, 947 F.2d 849, 853 (7th Cir. 1991) (noting that conclusory allegations of ineffective assistance are insufficient to satisfy a defendant's burden of showing cause) (citation omitted).  Similarly, the unsupported contentions fail to explain how prejudice resulted. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

government, "[r]ather, the court considers whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses." *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999), *cert. denied*, 533 U.S. 961 (2001). A court must grant a new trial if that evidence "preponderates heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand," *id*. at 658 (citation omitted), or where "trial errors or omissions have jeopardized the defendant's substantial rights." *United States v. Reed*, 986 F.2d 191, 192 (7th Cir. 1993) (citation omitted).

Further, if the court reaches the conclusion that "there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted—he has the power to set the verdict aside," even if no erroneous rulings were made at trial. *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (citing *United States v. Morales*, 902 F.2d 604, 605-06 (7th Cir. 1990), *amended*, *United States v. Morales*, 910 F.2d 467 (7th Cir. 1990)). "If the complete record, testimonial and physical, leaves a strong doubt as to the defendant's guilt, even though not so strong a doubt as to require a judgment of acquittal, the district judge may be obliged to grant a new trial." *Id.*

### III. Discussion

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. An attorney must not only be present with a criminal defendant at his trial, but must assist the defendant in a way that ensures the trial is fair. *Strickland v. Washington*, 466 U.S. 668, 685 (1984). A fair trial is one in which the adversarial process functions properly to produce a just result. *Id*. at 686.

To prevail on a claim for ineffective assistance of counsel, Mr. Sheneman must first demonstrate that counsel's performance was deficient—"that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. To show deficient performance, the defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011) (quoting *Strickland,* 466 U.S. at 688). "This means identifying acts or omissions of counsel that could not be the result of professional judgment. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (citing *Sussman v. Jenkins,* 636 F.3d 329, 349 (7th Cir. 2011)). Further, "there is a strong presumption that [the defendant's] attorney performed effectively," *Berkey v. United States*, 318 F.3d 768, 772 (7th Cir. 2003), and that the challenged conduct "might be considered a sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and quotation omitted). The reasonableness of counsel's performance must be evaluated "from counsel's perspective at the time of the alleged error and in light of all the circumstances." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). So long as an attorney articulates a strategic reason for a decision that was sound at the time it was made, the decision generally cannot support a claim of ineffective assistance of counsel. *Yu Tian Li v. United States,* 648 F.3d 524, 528 (7th Cir. 2011) (citing *United States v. Lathrop*, 634 F.3d 931, 937-38 (7th Cir. 2011) (provided counsel's reasons for not questioning further were not "so far off the wall that we can refuse the usual deference that we give tactical decisions by counsel, his performance will not qualify as deficient")); *United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005)).

Even if counsel's performance was deficient, Mr. Sheneman must also demonstrate that counsel's deficient performance prejudiced his defense—"that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. To establish prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Eckstein v. Kingston*, 460 F.3d 844, 848 (7th Cir. 2006) (quoting *Strickland*, 466 U.S. at 694); *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005) (quoting *Strickland,* 466 U.S. at 694). "In weighing the effect of counsel's errors, the court must consider the totality of the evidence. . . A verdict or conclusion that is overwhelmingly supported by the record is less likely to have been affected by errors than one that is only weakly supported by the record." *Eckstein*, 460 F.3d at 848 (quoting *Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001)).

Failure to satisfy either the performance or the prejudice prong of the *Strickland* test is fatal to a defendant's ineffectiveness claim. *Velarde v. United States*, 972 F.2d 826, 828 (7th Cir. 1992); *see Strickland,* 466 U.S. at 687 (reasoning that "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.").

The defense argues that this Court should order a new trial in the interests of justice on the sole ground that Mr. Truitt allegedly provided ineffective assistance at trial.

### Failure to Investigate and Call Three Particular Witnesses

Mr. Sheneman's primary contention is that Mr. Truitt did not sufficiently investigate the case and thus failed to call three witnesses that would have assisted in his defense. Specifically,

Mr. Holesinger argues that Mr. Sheneman had requested Mr. Truitt to contact and present an unidentified subprime lending expert (who could have discussed the twelve-month bank statement program about which Mr. Sheneman testified); Philip Bornstein (a New York attorney who drafted the contracts to sell and conducted the closings on the 128th Street properties); and, Kenneth Daniel (who served as Phyllis and Jeremie Sheneman's accountant). Mr. Holesinger asserts that Mr. Truitt was ineffective for failing to listen to Mr. Sheneman and call these witnesses.

The Seventh Circuit has held that "[i]t is well recognized that counsel must engage in a reasonable investigation or come to a defensible decision that a particular investigation is unnecessary. When counsel determines that investigation is unnecessary, his decision must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Koons v. United States*, 639 F.3d 348, 353-54 (7th Cir. 2011) (citations omitted). It is appropriate to consider what Mr. Sheneman told Mr. Truitt when determining the reasonableness of Mr. Truitt's investigation. *Id*.; *see Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.").

Ultimately, "[i]f counsel has investigated witnesses and consciously decided not to call them, the decision is probably strategic. An outright failure to investigate witnesses, however, is more likely to be a sign of deficient performance." *Best*, 426 F.3d at 945 (citations omitted).

Whether deficient performance occurred, however, depends on factors like counsel's overall diligence, the likely relevance of the witness's testimony, whether alternative ways of proving the point exist, and the strength of the government's case. *Id.*; *compare Washington v. Smith,* 219 F.3d 620, 630-34 (7th Cir. 2000) (finding that failure to investigate or call witnesses where "[counsel] admitted that he did no investigating because of the 'late date' and because he was 'busy trying the case'" was deficient and prejudicial given that the eyewitnesses would have testified to facts consistent with the defendant's alibi concerning his whereabouts) *with United States v. Williams*, 106 F.3d 1362, 1367 (7th Cir. 1997) (in a felon-in-possession case, counsel's failure to call witnesses who would have testified to the guns ownership and the fact that the fingerprints of another person were found on the gun was not deficient performance where the government had proved each element of the crime); *see also Patel v. United States,* 19 F.3d 1231, 1237 (7th Cir. 1994) ("Where a [defendant] claims his trial counsel failed to call a witness, he must make a specific, affirmative showing as to what the missing evidence would have been, and prove that this witness's testimony would have produced a different result." ) (citation and internal citation omitted).

<u>Expert on Subprime Lending</u>

Mr. Sheneman argues that Mr. Truitt was ineffective for not calling an expert who could explain subprime lending procedures and distinguish other lending programs from the subprime twelve-month bank statement program that was available at the time (and that could have been used to secure the properties according to Mr. Sheneman's testimony alone). Mr. Sheneman argues that the jury heard only government witnesses testify about the mortgage lending and underwriting process, but an expert on subprime lending would have purportedly explained to

the jury how Phyllis Sheneman's income was calculated by the lenders and then recorded by them on the residential loan applications. Thus, it is Mr. Sheneman's contention that this testimony would have shown that the income calculations were consistent with the 2005 banking practices, and that the income reflected on the loan applications was correct. The defense has not yet identified an expert who would in fact testify to these matters.

In response, the government argues that there was no evidence to indicate whether the loans were subprime or not, let alone to suggest that a twelve-month bank statement program was used;[4] however, as anticipated by Mr. Truitt, the evidence introduced at trial showed that Phyllis Sheneman had money and a good credit score, and she did not need subprime loans. In fact, Mr. Sheneman placed the mortgages in his grandmother's name because he could not get approved for the loans, even as a co-borrower, given his poor credit.

Despite the fact that it did not appear that subprime loans were used, Mr. Truitt testified at the evidentiary hearing that he investigated subprime lending and 2005 banking practices by reading a number of articles on the topic. Mr. Truitt did not believe that a subprime lending expert would assist Mr. Sheneman's defense because Phyllis Sheneman had a good credit score and really did not need subprime lending. Moreover, Mr. Truitt was under the impression that a subprime expert would have duplicated the expected testimony of government witness Mr. Eric Oswald, an independent consultant with extensive experience in mortgage loan procedures and lending practices both locally and nationally. Mr. Truitt also anticipated that Mr. Sheneman himself would explain to the jury the relevance of the twelve-month bank statement program that he contended was used to calculate the income on the loan applications. Admittedly, Mr. Truitt

---

[4]Even Mr. Holesinger was unable to identify for the Court which loans were subprime and used a twelve-month income calculation, if any.

did not discuss the option of hiring a subprime lending expert with Mr. Sheneman, but he also did not recall Mr. Sheneman wanting to hire such an expert.

The Court finds that Mr. Truitt's investigation was adequate and Mr. Truitt did not perform deficiently by deciding not to call a subprime lending expert.

First, Mr. Sheneman has never identified a witness that would likely have been available to testify and who would have given the proffered testimony. *See United States v. Hattermann*, 853 F.2d 555, 559 (7th Cir. 1988) (defendant failed to present any evidence indicating that expert witnesses were available to testify with regard to his cancerphobia). Instead, Mr. Sheneman merely speculates that such an expert could be found.

Second, after investigating subprime lending standards and the facts of this case, Mr. Truitt reasonably decided that an expert witness on subprime lending was not necessary. Mr. Truitt knew before trial that Phyllis Sheneman wanted Mr. Sheneman to use her good credit to obtain investment properties in her name. He also knew that there was no evidence that a subprime twelve-month bank statement program was actually used to calculate Phyllis Sheneman's income. Thus, Mr. Truitt consciously decided not to call a subprime lending expert because the evidence would indicate that Phyllis Sheneman was not in need of subprime lending or that subprime loans were issued. *See Best*, 426 F.3d at 945 (noting that if counsel investigated a witness and consciously decided not to call the witness, the decision is probably strategic and is generally not subject to review).

Even assuming that Mr. Truitt failed to sufficiently investigate and performed deficiently by not hiring a subprime lending expert, no prejudice resulted. The testimony of Mr. Oswald and Mr. Sheneman himself established that the lenders relied on material information that Mr.

Sheneman provided to issue the mortgage loans, regardless of whether the loans were conventional, subprime, or another type of loan, and regardless of whether a twelve-month income calculation was conducted.

Specifically, Mr. Oswald testified that even in 2005 all lenders wanted to know the risk of lending money and conducted their risk assessment based on the information in the loan applications. Mr. Oswald explained the significance of identifying the source of the funds used to purchase the property and the intended use of the home (whether primary, secondary, or investment),[5] he explained the significance of accurately disclosing debts and assets,[6] and he discussed the importance of providing confirmation that any conditions required by lenders were satisfied before the loan closed. Mr. Oswald explained that even lenders who sold loans on the secondary market would conduct a risk assessment because they could be forced to buy back loans in the event of an early default or misrepresentations discovered in the loan documents.

Mr. Sheneman testified that based on his work as a loan officer for two years at Tri State Mortgage, he knew that lenders wanted to know if borrowers would be able to pay back the loans. He also knew that lenders were going to rely on the information in the loan applications, including representations concerning the intended use of the property and the borrower's monthly income, assets, liabilities, real estate owned, and credit score.

Thus, the testimony of Mr. Oswald and Mr. Sheneman established that lenders wanted to

---

[5]Mr. Oswald explained that lenders consider primary homes to be owner-occupied homes that will maintain their value and carry the least risk of non-repayment. Primary homes generally have the lowest interest rates. A secondary home is generally a vacation home which is not rented for income purposes. Investment properties are rental properties which are usually not owner-occupied, are associated with higher risk, and require a higher down payment and higher interest rate.

[6]Mr. Oswald explained that lenders are concerned about a borrower's debt-to-income ratio because the debt ratio significantly impacts a borrower's ability to repay a loan.

know their risk of getting loans paid back—even if they were subprime lenders. Their testimony also established that the risk assessment was based on the various representations contained in the loan applications, including financial information which Mr. Sheneman admittedly provided.

And although Mr. Sheneman wanted the jury to believe that he provided bank statements and financial documents that contained only truthful information, Mr. Sheneman was unable to provide the jury with a credible explanation for why the same bank statements, which he was admittedly sending to the brokers, resulted in Phyllis Sheneman's income being calculated differently on the various loan applications. In other words, despite being based on the same financial information, the loan applications for the various properties at issue did not reflect the same income amounts.

The evidence showed that Phyllis Sheneman's residential loan application for the purchase of 648 Guthrie, which Phyllis Sheneman admitted to filling out and signing, reflected that she earned $2,500 a month. [Gov't Exhibit 2B]. The loan closed on March 8, 2005. [Gov't Exhibit 1B]. However, the residential loan applications for the eight other properties purchased from July through October 2005 [Gov't Exhibit 1A], reflected that Phyllis Sheneman had various monthly income amounts which ranged from $10,500 to $16,750. [Gov't Exhibit 19A].

Mr. Sheneman attempted to explain away the income discrepancy by testifying that the rent generated on each property may have affected how the lenders and/or brokers calculated the income. But the jury was also confronted with Mr. Sheneman's admission to having falsified rental contracts. Specifically, Mr. Sheneman admitted that he submitted a phony lease contract which indicated that Phyllis Sheneman's primary residence located at 648 Guthrie was being

rented for $750.00 a month.[7]  In fact, the residential loan applications for 204-19 23rd Avenue,

3-25 125th Street, and 11-11 128th Street all indicated that 648 Guthrie was generating rent,

despite the fact that Phyllis Sheneman testified that she never rented out this primary residence.

[Gov't Exhibits 7B, 8B, 10B].  Thus, Phyllis Sheneman corroborated the defendant's own

admission that the rental information provided to the lenders and/or brokers was false.[8]  And Mr.

Sheneman told the jury that he knew that the lenders would rely on the rent generated from the

properties to approve the loans, and he knew that if Phyllis Sheneman had reported an actual

monthly income of $2,500 (as reflected in her residential loan application for 648 Guthrie) or if

she had reported an annual income of $15,000 (as reflected in her 2005 tax returns),[9] then she

---

[7]Government's Exhibit 7I consisted of a rental agreement dated July 15, 2005, indicating that Sandra White was renting 648 Guthrie.  Per Mr. Andrew Weiske's trial testimony, the agreement was sent to him by Mr. Sheneman.  The document contained a Superior Mortgage fax header (dated August 15, 2005).  Mr. Sheneman told the jury that he provided the phoney lease agreement at Mr. Weiske's request so that the mortgage could be sold on the secondary market after the loan closed.  But this testimony was not credible given that the residential loan application itself indicated that 648 Guthrie was generating rental income.

[8]In fact, the residential loan application for the property located at 1531 W. Nelson, Chicago, Illinois (dated July 21, 2005) also reflected that Phyllis Sheneman's primary residence on Willow Creek in Mishawaka was "to be rented." [Gov't Exhibit 5B].  Yet, Phyllis Sheneman testified that she never intended to rent Willow Creek; and, Mr. David Sommers (who personally helped Phyllis Sheneman receive financing for 648 Guthrie) testified that Phyllis Sheneman wanted to sell Willow Creek to pay off the mortgage on her new primary residence, 648 Guthrie, which closed on March 8, 2005.  Moreover, the government introduced into evidence the closing statement on the Willow Creek property which contained a settlement date of June 15, 2005, and reflected that the Willow Creek property was sold. [Gov't Exhibit 5C].

[9]Phyllis Sheneman testified that Mr. Sheneman never asked for her tax returns, but she thought he had requested her bank statements associated with her business.  Mr. Sheneman also testified that he never asked for his grandmother's tax returns because they were not required for the loans.  In its case in chief, the government introduced Phyllis Sheneman's 2005 individual tax return, which reflected that she reported approximately $15,000 in income, of which $250.00 came from her partnership [Gov't Exhibit 15A], and the government introduced her 2005 tax return for Second Time Around, which reflected that the partnership made approximately $74,000 in gross receipts/sales and had a total income of approximately $37,000 [Gov't Exhibit 15B].  To the extent that Mr. Sheneman contends that Mr. Truitt should have objected to the submission of the tax returns as evidence, such an argument is frivolous given that the information was relevant to proving Phyllis Sheneman's actual income, and given that there is nothing about this evidence that is prejudicial other than the fact that it was persuasive evidence of Mr. Sheneman's guilt. *See* Fed. R. Evid. 401-403.

16

would not have been approved for the various mortgage loans.[10]

Not only does this evidence defy Mr. Sheneman's argument that the lenders relied solely on a year's worth of bank statements in calculating Phyllis Sheneman's income (and thus, expert testimony concerning a bank statement program would be useless), but it also shows that no expert on subprime lending could have explained away the false information that Mr. Sheneman provided to the lenders, which he knew would be relied on.[11]

To summarize, testimony about how income was calculated by subprime lenders would not change the fact that Mr. Sheneman, as admitted at trial, provided the financial information and bank statements that those calculations were based on. The evidence showed that this information, which was then used to calculate income and relied upon to issue the loans, was false. Thus, regardless of how the lenders and/or brokers calculated income, even if according to a twelve-month bank statement program, the resulting income could not have been an accurate reflection of Phyllis Sheneman's income.

Moreover, even if an expert had testified to subprime lending practices and acknowledged that it was standard practice in the mortgage industry at the time to submit inaccurate financial information to lenders for the purpose of securing a mortgage, it is clear those false statements would be material and were provided by Mr. Sheneman, which formed a reasonable basis for the wire fraud convictions. Although lending practices were lax at the time and lenders oftentimes failed to verify the information contained in the loan applications because

---

[10]Mr. Oswald also testified that rental income would be considered by the underwriter in calculating the overall income and deciding whether to approve a loan application.

[11]To the extent Mr. Holesinger argues that Mr. Truitt should have admitted evidence tending to show that the information provided by Mr. Sheneman was not "material" information, such a defense position would have been defied by Mr. Sheneman's own trial admissions and defense theory.

they intended to sell them on the secondary market, this would not excuse Mr. Sheneman's submission of fraudulent information to secure the loans.

Any testimony about subprime lending practices and bank statement generated income calculations could not have produced a different trial result. The Court, therefore, concludes that Mr. Sheneman has not established that he was prejudiced by trial counsel's failure to call a subprime lending mortgage-industry expert.

Attorney Phillip Bornstein

Mr. Sheneman claims that Mr. Truitt provided ineffective assistance because he failed to have attorney Phillip Bornstein testify at trial. Mr. Holesinger admitted that had Mr. Bornstein testified at trial, it would not have changed the outcome of trial. But Mr. Holesinger argued that Mr. Bornstein, in conjunction with the other witnesses, would have provided testimony that "completes a picture" concerning who hired the individuals needed to close on the properties, who appeared at the closings, and who signed the closing documents. Mr. Holesinger conceded that only the brokers or lenders would have sent Mr. Bornstein the information to close on the properties, and therefore, Mr. Bornstein had no way of knowing who originally provided the information to the brokers or lenders.

In response, the government presented the testimony of Mr. Truitt who indicated that he received and reviewed the government's discovery before trial which contained a summary report prepared by FBI agents of Mr. Bornstein's interview. Not only did Mr. Truitt know Mr. Bornstein's position from having reviewed the government's discovery, but he also personally spoke with Mr. Bornstein prior to trial and then discussed this matter with Mr. Sheneman. Mr. Truitt testified that he chose not to have Mr. Bornstein testify at trial because he did not believe

that Mr. Bornstein's testimony would have promoted his trial strategy in showing that Mr. Sheneman did not provide false information in support of the loan applications.

Here, the Court believes that Mr. Truitt engaged in a reasonable investigation into the possibility of having Mr. Bornstein testify, but chose as a matter of trial strategy not to call Mr. Bornstein as a witness. Given that Mr. Bornstein had no knowledge about the origin of the information that appeared in the residential loan applications, Mr. Truitt's assessment that his testimony was not relevant to promoting the defense's position was objectively reasonable. *See Best*, 426 F.3d at 945 (noting that if counsel investigated a witness and consciously decided not to call the witness, the decision is probably strategic).

And as admitted by defense counsel, Mr. Sheneman cannot show that he was prejudiced by the failure to call Mr. Bornstein. Mr. Bornstein's testimony as proffered would not have changed the outcome of trial. In fact, Mr. Bornstein's proffered testimony would have been cumulative. Phyllis Sheneman testified that although Mr. Sheneman scheduled the closings in New York, she personally went to closings and signed closing papers in New York and Chicago. Similarly, Ms. Tatiana Collins (the New York real estate broker who helped Mr. Sheneman locate the New York properties to purchase) testified to meeting Phyllis Sheneman for the first time in New York for the closings on the 128th Street properties. Consistent with the defense strategy, Mr. Sheneman corroborated this testimony and explained to the jury that only Phyllis Sheneman signed contracts for the properties, even though she never saw some of the properties, because he told her to do so. Mr. Sheneman also told the jury that he never saw any residential loan applications prior to their submission to the lenders, and he never saw any documents until after the properties closed. Given this consistent testimony, there was no reason to offer

additional testimony by Mr. Bornstein that Phyllis Sheneman appeared at the closings and signed the closing documents. *See United States v. Monigan*, 128 F.3d 609, 612 (7th Cir. 1997) ("[i]t was entirely within counsel's discretion to decline calling a witness whose testimony he believed to be cumulative.").

Again, Mr. Sheneman's failure to establish that not calling Mr. Bornstein constituted ineffective assistance or resulted in prejudice dooms his claim. *See Strickland,* 466 U.S. at 687; *Velarde*, 972 F.2d at 828.

Accountant Kenneth Daniel

Lastly, Mr. Sheneman identified Mr. Kenneth Daniel as someone who should have been called as a witness at trial, but was not called to testify on account of Mr. Truitt's alleged ineffectiveness. Mr. Sheneman generally proposes that Mr. Daniel, the accountant for Phyllis and Jeremie Sheneman, would have been able to provide "a complete picture" about Phyllis Sheneman's income, given that documents concerning her tax liability and her ownership in the business, Second Time Around, were presented at trial and contained Mr. Daniel's signature.

In response, the government offered the evidentiary hearing testimony of Mr. Truitt who stated that although he never spoke with Mr. Daniel, his pretrial investigation revealed that various documents originated from Mr. Daniel's office where several people worked, but they did not come from Mr. Daniel himself. Moreover, Mr. Truitt knew from reviewing the government's discovery that Phyllis Sheneman was expected to testify that she never asked Mr. Daniel to send any documents, Mr. Daniel's would confirm that Phyllis Sheneman never contacted him to send the letters, and both Mr. Weiske and Mr. Veksler were going to tell the

jury that they received all of the necessary information from Mr. Sheneman.[12]  Therefore, Mr.

Truitt believed that Mr. Daniel's testimony, which would be corroborated by the testimony of

Phyllis Sheneman and the mortgage brokers, would only hurt Mr. Sheneman's claim that he was

not involved with requesting or sending the letters.  Mr. Truitt decided not to call Mr. Daniel

because Mr. Daniel did not personally send the documents and he was not going to help Mr.

Sheneman prove that Mr. Sheneman did not send the letters.  Prior to trial, Mr. Truitt did discuss

Mr. Daniel with Mr. Sheneman, but Mr. Truitt did not recall Mr. Sheneman requesting to have

Mr. Daniel called as a witness.

Here too, the Court believes that Mr. Truitt engaged in a reasonable investigation into the

possibility of having Mr. Daniel testify, but chose as a matter of trial strategy not to call him as a

witness.  Given Mr. Truitt's understanding that Mr. Daniel did not personally send the letters,

and his expectation that Mr. Daniel's testimony would corroborate the testimony of other

government witnesses without helping prove that Mr. Sheneman did not send the letters to the

brokers and/or lenders, Mr. Truitt's assessment that his testimony was not going to promote the

defense's position was objectively reasonable.  *See Rutledge v. United States*, 230 F.3d 1041,

1051 (7th Cir. 2000) (indicating that when counsel already knows what a potential witness is

going to say and makes a strategic decision not to pursue the testimony, counsel's performance is

not defective).

---

[12]In fact, Mr. Weiske and Mr. Veksler did testify that Mr. Sheneman provided all of Phyllis Sheneman's financial information to them, including the letters.  Specifically, Mr. Veksler confirmed that the information for the residential loan application on the 11-09A 128th Street property, the only loan he closed for the Sheneman's, was provided by Mr. Sheneman.  Mr. Veksler recalled requesting a letter from Mr. Sheneman concerning the ownership of Second Time Around, which he then received from Mr. Sheneman on August 23, 2005 by way of a fax from Superior Mortgage. [Gov't Exhibit 9C].  Mr. Weiske provided similar testimony and explained to the jury that all of the letters he received, which he then sent to the lenders to secure mortgages on the New York properties, came from Mr. Sheneman, including letters concerning Phyllis Sheneman's ownership in Second Time Around, her moving to New York to expand her clothing business, and information concerning her income, assets, and liabilities.

In addition, Mr. Sheneman cannot show that he was prejudiced by the failure to call Mr. Daniel. Even if Mr. Daniel would have testified that he sent the letters (concerning the nature of Phyllis Sheneman's business and her ownership in the business) to the brokers and/or lenders, Phyllis Sheneman's tax returns indicated the actual amount of income that was generated by the business—which was far less than the income amounts documented in the residential loan applications and supported by the letters.

Mr. Sheneman also overlooks the fact that the loan applications reflected more than just false information relative to Phyllis Sheneman's income. The residential loan applications did not identify Mr. Sheneman as the source of the purchase price funds, did not disclose the numerous properties purchased in 2005, and falsely identified the intended use of the properties—matters which Mr. Sheneman never suggests Mr. Daniel would have known about when the loan applications were submitted, and matters which Mr. Oswald and Mr. Sheneman testified were important to the lenders' risk analysis.

Thus, any error by Mr. Truitt in not further investigating or calling Mr. Daniel as a witness was not so serious as to deprive Mr. Sheneman of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687.

### *Failure to Establish the Origin of the "411" letters*

Mr. Sheneman contends that Mr. Truitt was ineffective for not "pursu[ing] the origin and validity of the 411 letters" [DE 93]—letters which contained a fax header from 411, Inc. Defense counsel did not expound upon the allegation, yet little discussion need be devoted to this argument anyway because the evidence undisputedly reveals that Mr. Truitt effectively established that the 411, Inc. faxes did not come from Mr. Sheneman.

Mr. Truitt testified at the evidentiary hearing that he discussed the 411, Inc. documents with Mr. Sheneman prior to trial. It was Mr. Sheneman's defense position that he did not author the documents and he did not know where the documents came from, but it appeared that the documents were sent by Mr. Weiske to the lenders, after Mr. Weiske received them from Mr. Daniel's office.

Given this strategy, during the cross-examination of government witness Mr. Weiske, Mr. Truitt asked about the origin of any documents which contained a fax header of "411, Inc." Specifically, Mr. Truitt handed Mr. Weiske government's exhibit 7E,[13] and asked what was the significance of the 411 header. Mr. Weiske testified that 411, Inc. was his marketing company and that "all [his] faxes that went out of [his] office went through that fax machine and that just happened to be the label on that company." [DE 80 at 127, Trial Transcript Vol. II]. Mr. Truitt also confirmed that the fax number that appeared on the fax header was Mr. Weiske's fax number. *Id*. Mr. Weiske then testified that he had nothing to do with preparing the document, but that Mr. Sheneman sent him the document and then Mr. Weiske forwarded it onto the lender. Mr. Truitt had Mr. Weiske confirm that in fact nothing on that particular document indicated that it came from Mr. Sheneman.

Simply put, Mr. Truitt's trial strategy for the identification of the 411, Inc. documents was not deficient. *See United States v. Jackson*, 546 F.3d 801, 814 (7th Cir. 2008) (extent of cross-examination of prosecution witnesses is a matter of trial strategy) (citations omitted). In

---

[13]Government's exhibit 7E was a letter dated August 16, 2005 bearing Phyllis Sheneman's signature which indicated that she derived business proceeds from her employment involving clothing manufacture and design. But Phyllis Sheneman testified that she did not write the letter and she had not given anyone permission to indicate that she was a clothing designer because it was not true. In fact, not only was she not a clothing designer, but Phyllis Sheneman testified that when she moved to 648 Guthrie in June 2005, she gave her half of the business to her daughter and no longer derived any income from the business.

fact, Mr. Truitt effectively cross-examined Mr. Weiske by having him identify the 411, Inc. fax header as belonging to his fax machine, and by pointing out that Mr. Weiske really had no way to prove that exhibit 7E was actually sent to him by Mr. Sheneman.

In any case, Mr. Sheneman also cannot establish that he was prejudiced by Mr. Truitt's handling of the 411, Inc. faxes. *See Jackson*, 546 F.3d at 814 ("even if we were to . . . assume that counsel's cross-examination was deficient, [the defendant] has not established a reasonable likelihood that additional cross-examination along the lines she has suggested might have resulted in her acquittal."). Mr. Sheneman testified at trial that any documents sent to Mr. Weiske from him would have a "Superior Mortgage" fax header on the top, and that anything with a 411, Inc. fax header came from Mr. Weiske. Mr. Sheneman told the jury that he did not know about any letters that Mr. Weiske sent to the lenders. However, the jury was also confronted with other documents, including government exhibit 7F which contained both a 411, Inc. fax header (dated August 14, 2005) and a Superior Mortgage fax header (dated August 15, 2005). Mr. Sheneman then admitted to sending this letter to Mr. Weiske for the mortgage loan application on the property located at 204-19 23rd Avenue.

Thus, the jury was confronted with a credibility call—whether to believe that Mr. Sheneman truly had no knowledge of various letters which originated from Mr. Daniel's office; or, to believe Mr. Weiske and Mr. Veksler who testified that they requested the information from Mr. Sheneman and then received the letters from Mr. Sheneman. The fact that the jury chose not to believe Mr. Sheneman's version was not a result of Mr. Truitt's rendering ineffective assistance.

*Failure to Argue the Insanity Defense*

To the extent that Mr. Sheneman suggests Mr. Truitt was ineffective for failing to have Mr. Sheneman examined by a mental health expert and failing to pursue an insanity defense,[14] the Court disagrees. Counsel is not required to discuss every possible defense with the defendant, especially one not suggested by any evidence. *St. Pierre v. Walls,* 297 F.3d 617, 628 (7th Cir. 2002) (counsel's ineffectiveness considered in the context of a plea of guilty) (citing *Evans v. Meyer*, 742 F.2d 371, 374 (7th Cir. 1984)).

At the time Mr. Sheneman proceeded to trial, Mr. Truitt was aware that Mr. Sheneman had been diagnosed as bipolar and that in February 2011 Mr. Sheneman had admitted himself into the hospital on account of his depression and thoughts (or attempts) of suicide. However, in March 2011, the Court held a status conference during which Mr. Sheneman appeared with Mr. Truitt and it was determined that Mr. Sheneman had resumed taking his medicine. At that time, there was no question that Mr. Sheneman was ardently assisting in his defense and was competent to stand trial, as confirmed by his active participation in his defense and testimony.

More importantly, despite Mr. Sheneman's recent history of depression and suicidal tendencies, there was never any indication that Mr. Sheneman was mentally unfit at the time of the crimes or the trial. Avoiding "the distorting effects of hindsight" and viewing this situation "from counsel's perspective at the time," the Court concludes that Mr. Truitt's conduct was proper under the circumstances because there were no indications of mental incompetence or insanity at the time Mr. Sheneman committed the crimes or went to trial. *St. Pierre,* 297 F.3d at

---

[14]In reality, Mr. Holesinger did not present argument on this issue during the evidentiary hearing, yet he did ask Mr. Truitt questions relative to Mr. Sheneman's mental capacity, and thus tacitly suggested that Mr. Truitt was ineffective for not having Mr. Sheneman evaluated by a mental health expert. The Court deems this unsupported argument waived, if not withdrawn, but addresses the merits of the issue in the interest of thoroughness.

628 (citing *Strickland*, 466 U.S. at 689). Even today, there is only evidence of some psychological issues but nothing at all suggesting incompetence or insanity.

Moreover, Mr. Sheneman cannot demonstrate prejudice based on this argument. There is no evidence to suggest that Mr. Sheneman would have attempted to, or would have been successful at, pleading the insanity defense. Mr. Sheneman has consistently denied having committed any crime, he told the jury that he did not provide false information, and he continues to maintain his innocence—not because he was unable to appreciate the nature and quality or the wrongfulness of his acts, but because he has consistently claimed to have had no knowledge of the false information that was provided on the residential loan applications. Thus, Mr. Sheneman cannot show that he suffered any prejudice by not having undergone a mental health evaluation or not having pled an insanity defense.

### Alleged Error During Closing Argument

Mr. Sheneman alleges that Mr. Truitt rendered ineffective assistance by essentially ignoring Mr. Sheneman's not guilty plea and conceding guilt during his closing argument. Specifically, Mr. Sheneman contends that Mr. Truitt essentially admitted that Mr. Sheneman defrauded the bank by stating during closing arguments that "[a person] can't defraud someone or an institution or a bank if they don't care if they are defrauded, and that's what has happened." [DE 81 at 132, Trial Transcript Vol. III]. Again, defense counsel does not elaborate on why this statement constitutes ineffective assistance.[15]

---

[15]During the evidentiary hearing, Mr. Holesinger did not present argument on this issue, but he did ask the Court to consider whether Mr. Truitt was ineffective for making this statement during closing argument. After the hearing, Mr. Holesinger did not expound upon the contention, despite the Court's giving him an opportunity to do so. The vacuous argument is waived, if not withdrawn, because the Court is unable to assess why Defendant believes that the statement is damaging, how making the statement fell below the objective reasonableness standard, or how Mr. Sheneman was prejudiced. *See Lawson*, 947 F.2d at 853 (noting that conclusory allegations of

"What is true, although it really has nothing to do with ineffective assistance, is that a defendant cannot be made to plead guilty against his wishes, however wise such a plea would be." *Underwood v. Clark,* 939 F.2d 473, 474 (7th Cir. 1991) (citing *Jones v. Barnes*, 463 U.S. 745, 751 (1983)).  And if a lawyer told the jury in closing argument, "my client has decided to plead guilty," that would be a forced plea, and would deprive the defendant of his right to put the prosecution to its proof of guilt. *Id*. (citing *Byrd v. United States*, 342 F.2d 939, 941 (D.C.Cir. 1965)).

However, Mr. Sheneman's trial counsel did not (as the defendant contends) concede that the defendant was guilty of the charged offenses.  Rather, Mr. Truitt maintained a theme during the trial, which consisted of the following:  first, Mr. Sheneman did not provide any false information to anyone; second, the lenders/brokers submitted the false information on the loan applications; and third, given the lending climate of the time, which involved loose lending standards, the lenders made the loans without seeking verification of the information contained in loan applications because they were going to sell the loans on the secondary market.  During the presentation of the evidence and in his closing, Mr. Truitt maintained that Mr. Sheneman forwarded Phyllis Sheneman's accurate financial information to the brokers, the brokers/lenders filled out the residential loan applications with inaccurate information, Phyllis Sheneman signed the applications, and Mr. Sheneman never saw a completed loan application before any closing.  Thus, whatever false information appeared in the loan applications was the result of poor practices in the lending industry, and not Mr. Sheneman's doing.

Therefore, when the contested statement from Mr. Truitt's closing argument is

ineffective assistance are insufficient to satisfy a defendant's burden of showing cause).  Although the Court could summarily reject the argument, the Court addresses it in the interest of thoroughness.

considered in its context, it is clear that Mr. Truitt was arguing that the lenders had an opportunity to examine the applications and demand supporting documentation; but instead, in 2005 lenders were accepting representations made in loan documents without seeking verification because the loans would be resold anyway. Therefore, it was easy for others to take the information that Mr. Sheneman provided and misrepresent that information on the loan applications without being detected. Mr. Truitt also argued that given the fact that no banks were complaining that it was Mr. Sheneman who defrauded them, it was clear that Mr. Sheneman was not the person who provided the false information.

The Court finds that Mr. Truitt's trial tactic was reasonable, and a lawyer is not required to consult with his client on tactical moves. *See Underwood,* 939 F.2d at 474 (citation omitted). The fact that the jury chose not to believe this defense does not mean that the Court is required "to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.

Further, even if Mr. Truitt's comment during closing argument was unwise or deficient, it did not prejudice Mr. Sheneman. *See Strickland,* 466 U.S. at 687 (reasoning that "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable."). The Court instructed the jurors immediately after closing argument to reach their verdict based only on the evidence and the law given by the Court, and to disregard the lawyers' comments in closing argument to the extent they were not supported by the evidence. *See United States v. Benabe,* 654 F.3d 753, 779 (7th Cir. 2011) (noting that the appellate court assumes that the jury followed the instructions that were given). Moreover, Mr. Sheneman's guilt was overwhelmingly supported

by the record, and it cannot be shown that Mr. Sheneman was deprived of a fair trial, or that but for Mr. Truitt's statement, there is a reasonable probability that the result of the trial would have been different. *See Strickland*, 466 U.S. at 687; *Eckstein*, 460 F.3d at 848.

***Alleged Errors Considered in Concert and Evidence of Guilt***

Although the Court has individually addressed Mr. Sheneman's contentions of Mr. Truitt's alleged deficient performance, in making its determination the Court has considered the cumulative effect of the errors alleged by Mr. Sheneman. *See Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005) ("ineffective assistance of counsel is a single ground for relief no matter how many failings the lawyer may have displayed. Counsel's work must be assessed as a whole; it is the overall deficient performance, rather than a specific failing, that constitutes the ground of relief."); *Washington v. Smith*, 219 F.3d 620, 635 (7th Cir. 2000) (the court must assess "the totality of the omitted evidence under *Strickland* rather than the individual errors") (citation omitted). Much of Mr. Sheneman's claims of ineffective assistance of counsel relate to the reasonableness of his attorney's trial strategy and tactics, and the alleged failure of his attorney to conduct a proper investigation. The Court provided Mr. Sheneman with ample opportunity to provide evidence which would demonstrate the deficiency in Mr. Truitt's performance, however, Mr. Sheneman has been unsuccessful in his attempts to supplement the record to support his claims.

In fact, the record reflects that Mr. Truitt proceeded on Mr. Sheneman's theory, which at the time of the trial was to explain to the jury that Phyllis Sheneman wanted to buy properties, that she had the money and good credit to do so, and that after other individuals filled out the loan applications, Phyllis Sheneman received and signed the loan documents. Mr. Sheneman's

defense was that although he sent Phyllis Sheneman's bank statements and financial information

to the brokers, he did not calculate her income, never saw the residential loan applications prior

to their submission to the lenders, never signed the loan applications, and did not provide false

information. The Court concludes that Mr. Truitt's performance in presenting this defense

theory fell well within the range of competence demanded of criminal attorneys, and did not

constitute deficient performance or result in prejudice.

The Court has taken into consideration the fact that Mr. Truitt's investigation included

his independent research into the lending practices at the time, his review of thousands of

discovery documents, and his meeting with Mr. Sheneman on numerous occasions to discuss the

case. Overall, Mr. Truitt and his office staff spent 563.9 hours working on this case and

preparing for trial. [Gov't Exhibit 1, evidentiary hearing]. Mr. Truitt alone spent approximately

260 hours working on this case. [Gov't Exhibit 1, evidentiary hearing]. In fact, Mr. Truitt

testified that he decreased his case load while he was involved in Mr. Sheneman's case, so he

would have sufficient time to prepare and proceed. Mr. Sheneman has simply not shown that

Mr. Truitt was ineffective in failing to adequately investigate the case. *See Hardamon v. United

States,* 319 F.3d 943, 951 (7th Cir. 2003) (to show ineffectiveness on a supposed failure to

investigate, the defendant has the burden of providing the court with sufficiently precise

information as to what the investigation would have produced). And the fact that Mr. Sheneman

might believe that his counsel could have or should have employed a different strategy when

addressing certain issues at trial does not render his performance ineffective. *See Gentry v.

Sevier*, 597 F.3d 838, 851 (7th Cir. 2010) ("[t]rial strategies are generally left to the discretion of

counsel and second-guessing strategic decisions in hindsight will generally not be a meritorious

basis to find ineffective assistance of counsel.") (citation omitted). From the Court's perspective, defense counsel did an admirable job especially in a case where there was substantial evidence of Mr. Sheneman's guilt.

At trial, the government presented substantial evidence of Mr. Sheneman's guilt, consisting of approximately 85 exhibits and 11 witnesses (much of which has been previously discussed herein). And although Mr. Sheneman maintains that he never sent false information to the brokers and/or lenders, the evidence suggested otherwise. For instance, Mr. Sheneman admitted to previously being a loan officer at Tri State Mortgage and to knowing a great deal about the lending business and the information required to get mortgage loans approved. Mr. Sheneman specifically admitted to sending several letters indicating that he was providing the funds for the down payments and the closings, yet Phyllis Sheneman testified that she was unaware of any arrangement between her and Mr. Sheneman regarding down payments, and she did not know that oftentimes she was given a gift of money from Mr. Sheneman.[16] Phyllis Sheneman also testified that she never rented out her home located on Willow Creek or her subsequent primary home located at 648 Guthrie, yet several loan applications indicated otherwise. [Gov't Exhibits 5B, 7B, 8B, 10B]. In addition, loan applications which were submitted later in 2005, did not reflect the fact that Phyllis Sheneman had closed on several properties earlier in 2005. Mr. Weiske testified that when he helped secure financing on the New York properties, he did not know about Phyllis Sheneman's ownership of the Chicago and California properties; and, Mr. Veksler testified that when he assisted with the financing on the 11-09A 128th Street property, he only knew about Phyllis Sheneman's ownership of 648 Guthrie

---

[16]An analysis of Mr. Sheneman's bank accounts by FBI forensic account L. Christopher Knight and testimony by Mr. Sheneman confirmed that at least $700,000 of Mr. Sheneman's money was used to fund the loans.

Street, 6605 N. Artesian, and 1531 West Nelson Street (the only properties disclosed in the loan application). Further, Phyllis Sheneman testified that all of the homes, except 648 Guthrie, were to be investment properties. Yet, three loan applications reflected that the properties were to be primary residences and two loan applications reflected that the properties were to be secondary residences. Mr. Sheneman testified that all of these misrepresentations were the fault of the brokers and/or the lenders. Yet, Mr. Weiske, Mr. Veksler, and Ms. Collins[17] testified that they received the information needed for the loans from Mr. Sheneman.

And despite Mr. Sheneman's testimony that he did not work for Superior Mortgage, the jury heard him admit to having a key to the building, an office in the building, and access to Superior Mortgage's fax machine. Both Lauren Duesler and Tanya Boettcher worked at Superior Mortgage and testified that Mr. Sheneman worked after normal business hours, handled his own loan files, verified that loan conditions were met, and set up his own closings. In fact, Ms. Boettcher testified that she got fired from Superior Mortgage shortly after telling the owner that she had concerns with Mr. Sheneman's loan applications which did not include original paperwork; and, Ms. Duesler testified that one day a lender called the office and Mr. Sheneman asked her to pretend to be Phyllis Sheneman over the phone.

Relative to the evidence of guilt on the specific counts in the indictment, Special Agent Manuel Colin of the United States Department of Housing and Urban Development testified that he spoke with Mr. Nathan Pinkhasov, the settlement agent for the mortgage lender (Option One

---

[17]Ms. Collins told the jury that when she first met Mr. Sheneman, he represented that he was looking for four homes in New York that were to be funded by an expected inheritance of $1,000.000.00 from his grandmother. Ms. Collins also explained that she never had Phyllis Sheneman's contact information, but she received Phyllis Sheneman's credit report, financial statements, banking statements, and other documents by fax from Mr. Sheneman, which she then forwarded to the broker.

Mortgage Corp.) for the property located at 11-09A 128th Street. Agent Colin's testimony confirmed that Mr. Pinkhasov received the wire transfer from Mellon Bank N.A. (located in Pittsburgh, Pennsylvania) into his escrow account (located in Rego Park, New York), on October 3, 2005, and that the wire transfer was in the amount of $561,945.58. This money was to fund the first mortgage for the closing on 11-09A 128th Street, as alleged in count 1 of the indictment.

Relative to count 2 of the indictment, Ms. Tammy Triolo, the escrow officer for Equity Settlement Services (located in Smithtown, New York), testified that she received the September 15, 2005 fax from GreenPoint Mortgage (located in Connecticut), which consisted of forms that had to be completed and sent to GreenPoint Mortgage before the closing on the 11-11 128th Street property could occur.

Relative to count 3 of the indictment, Mr. Weiske and Ms. Triolo identified the October 3, 2005 fax transmission from Ms. Triolo (located in New York) to Mr. Weiske (located in California) concerning fee request submissions and proof of insurance which were needed in order for the first and second mortgages to be issued on the property located at 11-11 128th Street.

Ultimately, the jury had to decide whether to believe the various government witnesses who testified relative to Mr. Sheneman's involvement, or to believe Mr. Sheneman's version of the events. The jury convicted Mr. Sheneman. But the Sixth Amendment does not guarantee a not guilty verdict. *See United States v. Wilks*, 46 F.3d 640, 644 (7th Cir. 1995). The mere fact that counsel's defense strategy was unsuccessful does not render counsel's assistance constitutionally ineffective. *See Strickland*, 466 U.S. at 689.

**IV. Conclusion**

Based on the foregoing, Mr. Sheneman has not shown that Mr. Truitt performed

deficiently, he was prejudiced by Mr. Truitt's performance, or the interest of justice requires the

Court to grant his Rule 33 motion. Accordingly, the Defendant's Motion for a New Trial [DE

92] is DENIED.

SO ORDERED.

ENTERED:   May 18, 2012

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court